**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

November 17, 2026

**By ECF**
The Honorable Colleen McMahon
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: *United States v. Mohammad Baqer Saad Dawood Al-Saadi*, S1 26 Cr. 220 (CM)**

Dear Judge McMahon:

The Government respectfully submits this supplemental letter in further opposition to defendant Mohammad Baqer Saad Dawood Al-Saadi's letter motion, dated August 25, 2026, to vacate, or in the alternative, modify, the Special Administrative Measures ("SAMs") imposed on him (Dkt. 14 (the "Motion")), and in response to the Court's order dated November 2, 2026, reserving judgment on the limitations imposed on Al-Saadi's calls with his family members and interactions with other inmates while he is in the custody of the Federal Bureau of Prisons ("BOP").

For the reasons set forth below, the SAMs restrictions are warranted in light of the significant safety concerns that Al-Saadi continues to pose while in custody. Since his arrest in this case, among other things, Al-Saadi has used his calls with family members to pass coded messages to co-conspirators with whom Al-Saadi had previously committed multiple acts of terrorism. For example, in the days leading up to an international terrorism plot that targeted a military base in the United Kingdom, Al-Saadi directed his family members on a phone call to give one of his co-conspirators (who ultimately attempted to carry out the plot) "the money so we can do it." On November 10, 2026, after the Government filed its first opposition to the Motion (the "Response"), the Government filed superseding charges against Al-Saadi and those co-conspirators for their roles in the historical attacks and active terrorist plotting in the United Kingdom while Al-Saadi was in custody. The SAMs restrictions are a necessary and appropriate guardrail to mitigate the threat Al-Saadi continues to pose. Accordingly, the Court should not vacate or modify those restrictions.

## I. Background

### A. The Charged Offenses and the Superseding Indictment

As described in detail in the Response, the charges in the original indictment stemmed from Al-Saadi's role working with and on behalf of FTOs, including Kata'ib Hizballah and the IRGC, and his involvement in planning and promoting nearly 20 terrorist attacks and attempted attacks

against civilian targets in Europe (the "European Terrorist Attacks") and the United States between in or about March and April 2026. (Response at 2-9). On November 10, 2026, a Grand Jury sitting in the Southern District of New York returned a superseding indictment (the "Superseding Indictment") charging Al-Saadi with the same offenses as in the original indictment, along with two of Al-Saadi's co-conspirators—Mohsen Mohajeri and Mohammed Ali Al-Hassani—who were charged with a subset of those offenses. In addition, the Superseding Indictment alleges that, even following Al-Saadi's incarceration in this case, Al-Saadi coordinated with Mohajeri and Al-Hassani, including the days leading up to an attempted terrorist plot against a British Royal Air Force Base ("RAF Fairford") in Fairford, United Kingdom (the "RAF Fairford Terrorist Plot") in approximately September 2026. Mohajeri and Al-Hassani remain at large and are believed to be in Iran.

### B. The Defendants' Planning and Directing of the European Terrorist Attacks

Among other things, the Superseding Indictment described the personal involvement of Al-Saadi, Mohajeri, and Al-Hassani in planning and directing the European Terrorist Attacks.

For example, as alleged in the Superseding Indictment, on or before April 6, 2026, in a video recovered from Al-Saadi's own cellphone, Mohajeri and Al-Hassani were recorded planning attacks while together in a room in Iraq with a map of London displayed on a computer screen. (Dkt. 40 at 9). The video is attached to this motion as Exhibit 1. In the video, Mohajeri told Al-Hassani, "we need to get focused on London." Starting one week later, Harakat Ashab al-Yamin al-Islamiya ("HAYI")—the front organization for Kata'ib Hizballah—perpetrated six terrorist attacks in and around London, claiming responsibility for each. The room in which the video is filmed (as depicted in the photograph below on the left side) appears to be in the same building (based on the matching wallpaper, chair colors, and table) where, in or about February 2024, Al-Saadi was pictured in front of an array of machineguns in a conference room with a map of the United States on the wall next to a list of "legitimate targets" (redacted here) identifying former and current U.S. officials (as depicted in the photograph on the right side). During an interview after he was arrested on or about May 1, 2026, Al-Saadi told U.S. law enforcement officials that the building in which that conference room was located was used for "military intelligence" for "the resistance."





On or about April 15, 2026, Al-Hassani participated in a video call with an individual committing an arson attack on a media organization that took place in London the same day, with the HAYI logo projected on Al-Hassani's computer screen. On the video call, Al-Hassani directed the individual to "Go as close as you can to the gate and dash it and show me on the camera I'm recording." The video, which was also recovered from Al-Saadi's own cellphone, is attached to this motion as Exhibit 2.

Two days later, on or about April 17, 2026, Al-Saadi, Mohajeri, and Al-Hassani directed an individual to carry out another of the European Terrorist Attacks—an arson attack on a Jewish charity organization in London—in real time. Specifically, Al-Saadi, Al-Hassani, and Mohajeri, along with others, were in a room watching a FaceTime video with the individual who was carrying out the attack, which was projected onto a large screen against the background of the HAYI logo. Al-Hassani directed the perpetrators' actions, including by instructing the individual on the other end of the call to execute the attack and directing that individual to take a lighter and "light one in your hand," "light it," and "throw the fourth one." Al-Saadi recorded the attack, while Mohajeri recorded Al-Hassani and Al-Saadi in the room as they directed the attack. The video, which was also recovered from Al-Saadi's own cellphone, is attached to this motion as Exhibit 3.

The next day, on or about April 18, 2026, Al-Hassani participated in another video call with an individual carrying out an attack on a synagogue in London, with the HAYI logo projected on Al-Hassani's screen. During the video call, Al-Hassani directed the individual to "light it up like a Christmas tree." The person then lit an improvised explosive device and threw it at a building. The video, which was also recovered from Al-Saadi's own cellphone, is attached to this motion as Exhibit 4.

As alleged in the Superseding Indictment, Al-Saadi, Mohajeri, and Al-Hassani also intended to plan future attacks in the United Kingdom and Europe beyond those for which HAYI had claimed responsibility in the United Kingdom. For example, on or about April 24, 2026, Mohajeri sent Al-Saadi an attachment titled "New Goals," which was a plan for future terrorist attacks that included images of synagogues and Jewish-owned businesses in and around London, as well as maps identifying those exact locations, and stated, "5 New Goals, send to Ali." Al-Saadi then sent the "New Goals" guide to Al-Hassani. Within the same minute, Al-Saadi responded and confirmed with Mohajeri that he had sent it to Al-Hassani. (Dkt. 40 at 12-13). As with the videos described above, the evidence of these communications was recovered from Al-Saadi's cellphone.

A few days later, on or about April 29, 2026, Al-Saadi and Mohajeri communicated about a stabbing attack in London that had occurred earlier that day, for which HAYI claimed responsibility. That same day, Al-Saadi instructed another individual with whom Al-Saadi had been in contact about the European Terrorist Attacks to post video footage of the attack and a HAYI propaganda video about the attack "in the news," telling the individual that, "[i]f God grants us success tonight, there will be a shooting at a restaurant." (Dkt. 40 at 13). Each of these communications was also recovered from Al-Saadi's cellphone.

### C. The RAF Fairford Terrorist Plot

On or about May 1, 2026, Al-Saadi was arrested and subsequently transferred to the custody of the United States to face prosecution. (Dkt. 40 at 14). As described in the Response, Al-Saadi has been in federal custody since his arrival in the United States. For approximately four months following Al-Saadi's arrest, there were no additional attacks or plots attributable to the defendants.

As alleged in the Superseding Indictment, by at least in or around August 2026, however, it appears that the defendants had reconstituted their terrorist plotting, with Al-Hassani directing and paying associates in the United Kingdom to conduct preparatory steps and arrange logistics for the RAF Fairford Terrorist Plot. For example, on or about August 22, 2026, Al-Hassani paid one individual ("Individual-1") to perform pre-operational surveillance of RAF Fairford's perimeter and subsequently received videos of the area surrounding the base. In or about September 2026, Al-Hassani also tasked and paid several individuals to help him prepare for the plot, and those individuals conducted preparations for the plot by procuring vans and barrels of fuel, researching the purchase of chemical accelerants, and buying metallic objects that could be used as explosive shrapnel. At Al-Hassani's urging, those individuals commissioned custom decals that they affixed to the vans to create the appearance that they were used by a fuel delivery business and a swimming pool supply business. (Dkt. 40 at 14-15).

On or about September 26, 2026, Al-Hassani tasked individuals to drive vans to the RAF Fairford base. Al-Hassani was in frequent communication with the van drivers, helping to coordinate their movements and directing them where to drive. At least two of the three vans, while en-route to the perimeter of RAF Fairford, encountered a security roadblock and were not permitted to proceed on their intended route. Al-Hassani communicated with the drivers and occupants of the vans both before and after encountering the security checkpoint. In the early

morning hours on or about September 27, 2026, law enforcement authorities in the United Kingdom recovered three white vans to which the fuel delivery business logos were affixed and arrested the occupants. (Dkt. 40 at 15).

### D. While on SAMs, Al-Saadi Passed Information and Directives to Mohajeri and Al-Hassani in Advance of the RAF Fairford Terrorist Plot

As the Court is aware, while in jail in New York awaiting trial in this case, Al-Saadi had phone and video calls with his immediate family members located in Iraq. Despite the limitations imposed on Al-Saadi and his family as part of the SAMs, and repeated admonishments about concerns that he was violating the SAMs, Al-Saadi used certain of those calls to pass coded messages to Mohajeri and Al-Hassani in the days leading up to the RAF Fairford Terrorist Plot. The FBI also determined that on the calls, Al-Saadi and his family frequently used coded language and acknowledged openly that if they did not do so, or if they referred explicitly to certain people, the FBI would likely terminate the calls. The FBI exercised its discretion to do so on several occasions. Summaries of some of those calls are below.[1]

*i. June 29, 2026: Using Pseudonyms to Reference Mohajeri*

During a call on or about June 29, 2026, Al-Saadi informed his mother that he owed money to Mohajeri, although he did so by referring to Mohajeri as "Abbas, Abu Daniel." As described in the Superseding Indictment, when Al-Saadi and Mohajeri previously discussed working together to carry out acts of terrorism, Mohajeri told Al-Saadi that he had a son named Daniel, and that Al-Saadi could transfer money to an account in his son's name.[2] "Abu" in Arabic means "father of." Al-Saadi was thus referring to Mohajeri as "Abu Daniel," *i.e.* father of Daniel.

In subsequent calls, Al-Saadi's mother confirmed that she was able to establish contact with Mohajeri, whom she referred to as "Abbas," and also later referred to Mohajeri as "Sayyid Abbas in Iran."[3]

*ii. July 30, 2026: Using the Code Word "Work" to Describe Future Terrorist Plotting*

During a call on or about July 30, 2026, Al-Saadi's mother told Al-Saadi that "Hashim" did not want "Amu Muhammad" to "take over the work" but that they would listen to Al-Saadi

[1] The Government has produced to defense counsel, on a rolling basis and in near real time, recordings and notes it has received of each of these calls.

[2] For example, on or about March 7, 2026, Mohajeri wrote to Al-Saadi, "I can come and work with you as a soldier for you . . . Should I come to you and become a martyr? . . . How can I help you? Should I come to your place and fight with you? . . . I want to come to you and fight." Later in the conversation, Mohajeri provided an Iranian bank account number to Al-Saadi, which Mohajeri described as an account to buy "equipment for jihad." Al-Saadi then requested a credit card number to use to transfer money. In response, Mohajeri sent Al-Saadi a picture of an Iranian credit card, which was in the name of "Daniel Mohajeri," who Mohajeri identified as "my son."

[3] "Sayyid" in Arabic is a commonly used title meaning Sir or Mister.

and follow whoever Al-Saadi identified. Al-Saadi responded by saying, "Tell him you are part of the work." Al-Saadi later asked his sister, "What are they doing about our old work?" Al-Saadi's sister responded, "It all stopped." Al-Saadi then asked, "So they paused it, but did not cancel it?" His sister responded, "Yes, it isn't canceled."

On this call, Al-Saadi was using the term "work" to refer to terrorist activity. Indeed, in past discussions with his HAYI coconspirators and social media posts inciting others to engage in terrorism, Al-Saadi used the term "work" to refer to acts of terrorism. For example, on or about March 7, 2026, Al-Saadi implored Mohajeri to come to Iraq "to take revenge" for the death of a particular Iranian leader and the same day posted a call to action online titled "Shadow soldiers," giving Al-Saadi's "permission" to "all silent cells" across the world to begin engaging in "work," *i.e.*, terrorist attacks against civilians and U.S. and Israeli targets. Additionally, in previous discussions with Mohajeri, Al-Saadi used the term "work" to describe partnering together to conduct terrorist attacks. For example, as described above, on or about March 2, 2026, Al-Saadi wrote to Mohajeri, "Due to the size and abundance of targets, is it permissible for me to coordinate with our brothers in Kata'ib Hizballah and have joint work and a combined attack of drones and missiles? I await your news . . . Speak to Al-Husseini, office management of Abu Hussein, so that the attack is very violent." Mohajeri responded, "There is no problem, but managing work must be in your hands, not with the battalions . . . and make sure to photograph a video and pictures." It is thus clear that Al-Saadi—who has no other known employment—was using the term "work" as code for terrorist activity.

*iii. September 24, 2026: Referencing Mohajeri and Al-Hassani in the Lead-up to the RAF Fairford Terrorist Plot*

During a call on or about September 24, 2026, Al-Saadi's mother again told him that Sayyid Abbas, *i.e.*, Mohajeri, was praying and that he was "trying." Al-Saadi then immediately asked how "Ali" was doing, and Al-Saadi's family informed Al-Saadi that Ali was transferred to the "International Section." Al-Saadi then instructed his family to contact Ali and to "give him money so we can do it." This call occurred less than three days before the RAF Fairford Terrorist Plot. As described below, Al-Saadi's references to "Ali" on this call were about Al-Hassani.

Indeed, as described above, Al-Hassani orchestrated the RAF Fairford Terrorist Plot after working together with Al-Saadi to carry out several of the European Terrorist Attacks. As alleged in the Superseding Indictment, Individual-1 likewise referred to Al-Hassani using the name "Ali" in communications regarding preparations for the RAF Fairford Terrorist Plot. And prior to Al-Saadi's arrest in the instant case, Al-Saadi, Mohajeri, and Al-Hassani had additional plans to conduct future attacks in the United Kingdom apart from those they had previously carried out. For example, as described above, Mohajeri sent Al-Saadi the "new goals" packet of some future terrorist attack sites in London on or about April 24 and told him to send it to "Ali," in reference to Al-Hassani. Tellingly, one of Al-Hassani's phone numbers was saved in Al-Saadi's cellphone as "Ali London," further underscoring that Al-Saadi's references to "Ali" were about Al-Hassani in the days prior to the RAF Fairford Terrorist Plot.[4]

[4] Following the September 24, 2026 call, the FBI and BOP exercised their discretion under the SAMs to limit Al-Saadi's calls to the minimum-allowable one call per month, due to their concerns

*iv. November 5, 2026: Referencing Terrorist Leaders and other SAMs Violations*

On or about November 5, 2026—a few days before the Grand Jury returned the Superseding Indictment—Al-Saadi had a video call with his mother and two sisters in Iraq. Al-Saadi began the call by staring into the camera and praying, citing "the enemy of all the world" and "an eye for an eye." Al-Saadi also invoked "supporters of Suleimani" and "Abu Mahdi" during the prayer, while gazing into the camera. Based on the context of the call, the FBI determined that Al-Saadi was further pledging retribution against Americans, similar to his numerous past statements described in the original indictment. For example, the original indictment describes that Al-Saadi worked closely with Qassem Soleimani and Abu Mahdi al-Muhandis, the former leaders of the IRGC-QF and Kata'ib Hizballah, respectively, before they were killed in a U.S. airstrike in or about 2020. *Id.* at ¶ 7. Following their deaths, Al-Saadi repeatedly sought to incite violence against Americans and published many such calls for violence on his social media accounts. *See, e.g.*, Dkt. 1 at ¶ 14.

The FBI determined that the call was replete with coded messages and Al-Saadi's family members intentionally avoiding saying certain names, at times cutting off Al-Saadi when he spoke and warnings that the call could be ended if they spoke explicitly.

Al-Saadi then told his family not to go anywhere and not to leave their house. In response, Al-Saadi's sisters said they would not travel and were only going to the mosque. Al-Saadi then told his family that if they travel, then they will probably bring you here, which FBI agents interpreted to mean arrested and brought to the United States.

Al-Saadi's sister said that Al-Saadi's "group" was "crying for him" and "are like orphans without him." Al-Saadi spoke extensively with his sisters about posting messages to his followers on social media. Al-Saadi's sister said "Do you authorize me to shut down my account and create a new one under your name, Muhammad Baqir to post on it? Would it be better?" Al-Saadi replied "Yes, yes. Better." Of course, Al-Saadi's sister receiving directions from Al-Saadi on a call to create an online account used to post messages to Al-Saadi's group in Al-Saadi's name is precisely the type of behavior that the SAMs are in place to prevent.

The FBI did not cut this call short, and it concluded in the normal course. The BOP terminated the link and Al-Saadi lost his connection. As a result, Al-Saadi's sister appeared to become angry and picked up her cell phone and took a picture of the video screen, which at the time, displayed the names of the FBI participants still logged in to the call—another clear violation of the SAMs that prevent filming or photographing the calls. (*See* SAMs para. 3(b).)

---

that Al-Saadi was using those calls to pass coded messages to his co-conspirators about ongoing terrorist plotting.

*v. Non-Legal Mail*

In addition to cutting off certain of Al-Saadi's calls because of concerns that they are in violation of the SAMs, certain non-legal mail has been held by the FBI due to concerns that it is also violative of the SAMs, and is being used by co-conspirators, specifically Mohajeri, to pass information to Al-Saadi.

Evidence recovered from a search warrant of certain electronic accounts and Al-Saadi's phone shows that Mohajeri and Al-Saadi frequently exchanged propaganda materials for HAYI, including summaries of certain of the European Terrorist Attacks. Attached as Exhibit 5 are the first two pages of one of those summaries, specifically for the HAYI attempted attack on Bank of America on or about March 28, 2026 in Paris. Below are screenshots of other similar HAYI propaganda materials. The booklet on the left shows the HAYI charter, and on the right is a packet created to highlight the HAYI attack on a media organization in London.







Al-Saadi has been sent non-legal mail from his family, which the FBI held to translate, evaluate, and assess its permissibility under the SAMs. An excerpt of certain pages of the packet are attached hereto as Exhibit 6. As an initial matter, the distinctive border of the packet bears a striking resemblance to that found on the HAYI materials referenced above (comparison shown below), indicating that the creator of these materials was likely the same person or group that created this piece of mail.



وحة كانت متعددة
صاد والخارجية والأمن.
حة الفساد، والتعاون
سية على أن العلاقة بين



س، هددت هذه الجماعة
ات تلغرام المرتبطة بحزب

هويتها الحقيقية، تمتلك
قاومة)، بما في ذلك حزب

Another indication of the same is that both sets of materials include in calligraphy the Basmala, a sacred invocation meaning "In the name of God, the Most Gracious, the Most Merciful," which is frequently included on materials sent from religious groups invoking a type of prayer over the materials therein, including Iran-aligned Shia militia groups. Moreover, the contents of the packet raise serious concerns which the SAMs are designed to prevent against, specifically, materials that could incite Al-Saadi and others to engage in future terrorist conduct. For example:

- Page 2 of Exhibit 6 portrays a picture of the FBI transporting Al-Saadi to the Southern District of New York, with the text that Al-Saadi was "kidnapped" and "brought to the United States" and that "charges [were] brought against him to satisfy Trump's instinct and portray the matter as a victory within the United States."

- Page 3 of Exhibit 6 shows the picture of a large rally, below, along with the text "The Arab tribe of Bani Saad is holding a large protest rally in Baghdad following the abduction of Al-Saadi by the American enemy."



- Page 14 of Exhibit 6 says, *inter alia*, that "Al-Saadi was able to crush America's tails in Iraq, by trampling the heads of their masters in Europe and America."

- Page 13 of Exhibit 6 says, *inter alia*: "Your reckoning is coming, that's a promise." Al-Saadi's family sent this message via Telegram to "anyone who defames their son or insults him."

- Pages 6, 7 and 12 of Exhibit 6 show images of large rallies with photos of Al-Saadi, along with terrorist leaders Soleimani and al-Muhandis and flags of terrorist groups, including Hizballah.









The FBI has not delivered other non-legal reading material, including texts in Arabic calling for revenge and ways to disseminate and guide the public. For example, the FBI did not deliver to Al-Saadi a text that contained a historic/theological account of revenge for the death of Imam al-Husayn. The book details the military campaign and seeking vengeance in blood for the

perpetrators. The author uses the lens of serving as the earthly executioner of God's divine justice to justify retribution. In another example, the FBI did not deliver an Islamic text that discusses the conduct of Shia preachers and speakers as they address and guide the public, which the FBI believes bears resemblance to Al-Saadi's description of himself as a propogandist for the Shia resistance and desire to incite and guide others through his actions.

The Government has been in frequent communication with defense counsel about materials that are held for evaluation for potential SAMs violations, and through that effort, has initiated a means to fast-track Al-Saadi receiving books and texts printed and sourced directly from defense counsel. Those materials are brought directly from defense counsel to the FBI, who clear them in short order to pass to Al-Saadi. Other materials provided directly from Al-Saadi's family members, such as the materials referenced above (which defense counsel does not review and are in Arabic) require longer to evaluate before a decision is made whether they are permissible under the SAMs.

## II. <u>Procedural History</u>

The Motion raised a variety of challenges to the SAMs, including arguments that the SAMs violated the applicable regulatory framework and Al-Saadi's rights under the Fifth, Sixth and Eighth Amendments, because, *inter alia*, Al-Saadi argued that he had not engaged in misconduct while in BOP custody and the SAMs were not reasonably related to any regulatory interest. (Motion at 9-11).

The Government filed its response in opposition to Al-Saadi's motion on September 28, 2026 (Dkt. 24). In an opinion and order dated November 2, 2026 (Dkt. 44, the "Opinion"), the Court granted in part and denied in part the Motion, and reserved judgement with respect to two issues raised in the Motion: (1) the FBI and BOP's decision to limit the number of calls Al-Saadi has with his immediate family members in Iraq, and (2) limitations on Al-Saadi's sharing a jail cell and communicating with other inmates while in BOP custody. With respect to the first issue, the Court permitted the Government additional time to "make a proffer as to why one prison call a month satisfies any legitimate penological objective or affords any more and better protection to the public than would some less restrictive practice." With respect to the second issue, the Court permitted the Government additional time to "submit a motion explaining why its decision to keep Mr. Al-Saadi in solitary confinement satisfies *Turner's* four-factor test and that his communications present a 'substantial risk' of 'death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons.'"

## III. <u>The SAMs Restricting Al-Saadi's Telephone Calls and Contact with Other Inmates Are Constitutional</u>

### A. Applicable Law

"Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense." *Bell v. Wolfish*, 441 U.S. 520, 537 (1979). "Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ

devices that are calculated to effectuate this detention." *Id.* Consistent with this principle, "the Government must be able to take steps to maintain security and order at the institution . . . ." *Id.* at 540; *see also United States v. Felipe,* 148 F.3d 101, 111 (2d Cir. 1998) (upholding severe post-conviction restrictions on inmate).

Of course, there are limits on the restrictions that prison officials may impose on a pretrial detainee. Specifically, "under the Due Process Clause, a detainee must not be punished prior to an adjudication of guilt in accordance with due process of law." *Wolfish*, 441 U.S. at 535. In accordance with this rule, "[a] court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538. "Absent proof of intent to punish, . . . this determination 'generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].''" *Block v. Rutherford*, 468 U.S. 576, 584 (1984) (quoting *Wolfish*, 441 U.S. at 538, in turn quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)) (brackets in original). "Restraints that are *reasonably related* to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial." *Wolfish*, 441 U.S. at 540. (emphasis added).

The Supreme Court has instructed that in determining whether restraints are justifiable, the courts should defer to the decisions of the BOP, because "prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations." *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 128 (1977); *see also Turner v. Safley*, 482 U.S. 78, 89 (1987); *Felipe*, 148 F.3d at 110. Accordingly, "courts should ordinarily defer to their expert judgment in such matters." *Pell v. Procunier*, 417U.S. 817, 827 (1974).

Deference is particularly appropriate when the restrictions at issue are intended to promote security concerns. For example, "prison officials may well conclude that certain proposed interactions, though seemingly innocuous to laymen, have potentially significant implications for the order and security of the prison." *Thornburgh v. Abbott*, 490 U.S. 401, 407 (1989). Thus, as long as prison officials "'put forward' a legitimate government interest, and provide some evidence that the interest put forward is the actual reason for the regulation," the restriction likely will be upheld. *Casey v. Lewis*, 4 F.3d 1516, 1520-21 (9th Cir. 1993) (quoting *Walker v. Sumner*, 917 F.2d 382, 385 (9th Cir. 1990), in turn quoting *Turner*, 482 U.S. at 89). For example, a prison administrator's failure "to specify a past event wherein a contact visit resulted in assault, escape, or hostage-taking, does not render irrational the adoption and implementation of a non-contact policy." *Id.* at 1521.

In establishing these principles, the Supreme Court has held that courts must consider four factors in evaluating the reasonableness of a prison regulation. *Turner*, 482 U.S. at 89; *see United States v. El-Hage*, 213 F.3d 74, 81 (2d Cir. 2000) (employing the *Turner* test to uphold the constitutionality of SAMs placed on a convicted terrorist facing further charges, despite their limiting his ability to prepare his defense). "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S. at 89. Second, the court should determine "whether there are alternative means

of exercising the right that remain open to prison inmates." *Id.* at 90. "Where 'other avenues' remain available for the exercise of the asserted right . . . , courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation."' *Id.* (quoting *Pell,* 417 U.S. at 827). Third, the court should consider the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Fourth, the court should consider "the absence of ready alternatives [as] evidence of the reasonableness of a prison regulation." *Id.* "This is not a 'least restrictive alternative' test: prison officials do not have to set up and then shoot down every conceivable alternative method of accommodating the [defendant's] constitutional complaint." *Id.* at 90-91.

**B. Discussion**

As set forth below, the SAMs restrictions in place to limit Al-Saadi's phone calls and interactions with other inmates are constitutional and serve the legitimate goal of protecting the public from Al-Saadi.

*i. Curtailment of Calls with his Family*

Paragraph 3(a) of the SAMs permits Mr. Al-Saadi to call only his immediate family members, who are defined as his spouse, children, parents, and siblings. Paragraph 3(b) states that those calls are not to be overhead by a third party, divulged in any manner to a third party, or recorded or preserved in any manner. Dkt. 14-1 at 11.

Each such call is, however, contemporaneously monitored and recorded by the FBI. Under Paragraph 3(e), if the FBI monitoring reveals "any indication" that Mr. Al-Saadi is discussing illegal activity, soliciting or encouraging acts of violence, or attempting to circumvent the SAMs, then the FBI may cut the call and prohibit Mr. Al-Saadi from communicating with his family "for a period of time" the length of which the Government will determine. *Id.* at 12.

The FBI and BOP exercised their discretion under the SAMs to limit Al-Saadi's calls with his family to one per month due to significant indications that Al-Saadi and his family were using those calls to discuss illegal activity and to solicit and encourage acts of violence. Subsequently, following the defendant's recent call on or about November 5, 2026, and the filing of the Superseding Indictment, the BOP and FBI have further informed the Government of their intention to, for the time being, cancel the defendant's future calls, determining that such calls present a "substantial risk" of "death or serious bodily injury to persons, or substantial damage to property that would entail the risk of death or serious bodily injury to persons." 28 C.F.R. § 501.3(1).

As to the first prong of the *Turner* test requiring a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it," the FBI and BOP's intent to prevent Al-Saadi from using calls with third parties to pass messages about criminal activity to his known co-conspirators and plotting future terrorist actions are clearly a legitimate governmental interest, and in light of Al-Saadi's conduct on his calls to date, limiting or cancelling those communications has a valid and rational connection to that objective.

*First*, the evidence overwhelmingly establishes that Al-Saadi plotted numerous, violent attacks with his co-conspirators Mohajeri and Al-Hassani mere months ago, and attempted additional attacks until the moment he was arrested. While Al-Saadi is undoubtedly presumed innocent until proof of his guilt is established beyond a reasonable doubt, the Court can nonetheless consider the strength of the proffered evidence against Al-Saadi in determining whether the restrictions in place are justified. Indeed, courts regularly rely upon such proffered evidence in making determinations about a defendant's pretrial liberty under the Bail Reform Act. Here, as evidenced by communications recovered from his own cellphone, Al-Saadi and Mohajeri explicitly discussed their plans for the European Terrorist Attacks and their desire to have "joint work" so that their attacks are "very violent." And as described in the Response, far from retreating from his terrorist agenda since his incarceration, Al-Saadi has since stated numerous times that his actions were justified and legitimate. (*See, e.g.*, June 1, 2026 Arraignment Transcript at 5, "I'm not guilty and in a war situation . . . I'm a prisoner of war. I'm not a threat. Our children and women are being killed by your rockets.").

*Second*, the risk of Al-Saadi encouraging and funding future terrorist actions on his calls with his family are not speculative nor alarmist. In addition to the terrorist attacks that Al-Saadi, Mohajeri, and Al-Hassani perpetrated and/or attempted earlier this year, it is clear that their "work" remained undone and that they had future aspirations to conduct further terrorist activity. As described above, on or about April 24, 2026—shortly before Al-Saadi's arrest—Mohajeri sent Al-Saadi an attachment titled "New Goals," which was a plan for future terrorist attacks that included images of synagogues and Jewish-owned businesses in and around London, as well as maps identifying those exact locations, and stated, "5 New Goals, send to Ali." It is thus evident that Al-Saadi's terrorist network intended to conduct future attacks in the United Kingdom. This gives significant context to Al-Saadi's inquiry of his family on the July 30, 2026 jail call described above about the status of "the old work," and whether it was cancelled or simply "paused." As described above, in the days, weeks, and months leading up to the RAF Fairford Terrorist Plot, Al-Saadi communicated with his family about passing messages to Mohajeri and Al-Hassani about that incident. The FBI and BOP's actions in curtailing Al-Saadi's calls were thus undertaken for concrete, discrete reasons, and not an abstract belief that Al-Saadi's calls could be dangerous.

*Third*, evidence of Al-Saadi's nefarious intent on the limited calls he was permitted is further shown by the care that he and his family took to avoid saying certain names on the calls and to not address certain topics explicitly. For example, as described above, Al-Saadi and his family did not refer to Mohajeri or Al-Hassani by their true names and used coded words like "work" to refer to terrorist activity.

The remaining prongs of the *Turner* test require the court to consider "whether there are alternative means of exercising the right that remain open to prison inmates"; the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and "the absence of ready alternatives [as] evidence of the reasonableness of a prison regulation." *Turner*, 482 U.S. at 90. Here, the efforts that FBI and BOP have undertaken to accommodate Al-Saadi's calls with his family underscore that there are no alternative means remaining to permit those calls to continue. The FBI already records the calls in real time, and on numerous occasions intervened to end certain calls when the highly trained counterterrorism agents focused on Iran terrorist proxy groups involved in monitoring the

calls had concerns that Al-Saadi was passing coded messages about terrorist activity and associates. Nonetheless, despite those interventions, Al-Saadi and his family persisted in discussing criminal activity on future calls, including about passing information and directives about the RAF Fairford Terrorist Plot. The curtailment of Al-Saadi's calls, therefore, is meant to interfere with his "discrete criminal planning or conduct," not an amorphous or vague potential risk. *See United States v. Basciano,* 369 F. Supp. 2d 344, 351 (E.D.N.Y. 2005).

The FBI and BOP have determined that the coded language Al-Saadi and his family used on these calls make it very difficult to detect in real time whether a call should be terminated at that time, and it is often only with hindsight—such as an ongoing investigation uncovering that one of Al-Saadi's co-conspirators was involved in orchestrating an active terrorist plot—that the meaning of certain phrases and comments on those calls become apparent. In this respect, the "measure of judicial deference owed to corrections officials" and the FBI counterterrorism agents listening to the calls and investigating the defendant's criminal network, "in gauging the validity of the regulation," should carry significant weight. *Turner*, 482 U.S. at 90. These officials have tried and failed a number of alternative accommodations, including cutting short certain calls in real time and limiting the number of calls the defendant is permitted, before concluding that there is currently no available alternative to allow the defendant calls with his family without serious risk that Al-Saadi will use those calls to endanger the public.

*ii. No Communications with Other Inmates*

Paragraph 1 (c)-(d) and Paragraph 6 prohibit Mr. Al-Saadi from sharing a cell with another inmate and prevent him from "communicating with any other inmate by making statements audible to other inmates or by sending notes to other inmates." Dkt. 14-1 at 5-6, 15.

Al-Saadi claims that by placing him in the functional equivalent of solitary confinement, the SAMs deny his constitutional rights. As a threshold matter, and as set forth at length above and in the Response, the bases for Al-Saadi's confinement conditions are rationally connected to a legitimate governmental interest—protecting the public from Al-Saadi and additional terrorist attacks. (*See Response* at 12-15). Moreover, Al-Saadi has not cited any case in which a court has ordered the BOP to place a SAMs inmate into the general population or otherwise required the inmate to have increased communications with inmates whose communications are not subject to restrictions. As a result, the SAMs did not arbitrarily place restrictive conditions on Al-Saadi; rather, the conditions are in direct response to the substantial risk that Al-Saadi's contacts and communications with third parties will result in serious harm to others.

More concretely, the SAMs restrictions on Al-Saadi's contact and communications with other inmates are rationally related to the Government's interest in preventing harm to others in two separate ways.

*First*, the BOP has determined that there are no alternative means available to prevent Al-Saadi from using communications with other inmates to communicate with people outside prison in furtherance of his terrorist goals. Al-Saadi's contact with his family on his prison calls in this sense has been instructive. The Court noted that Al-Saadi's "family calls are literally the only human contact this particular defendant has." But as described above, Al-Saadi has proven that

he will use the very limited means available to him to engage in criminality, including the plotting of discreet criminal acts by passing messages through family members to his co-conspirators about active terrorist plots. And Al-Saadi managed to do that despite real-time monitoring of those communications and the FBI terminating many such communications as they were happening. If Al-Saadi were permitted to interact with other inmates, the BOP has determined that there would be no way to prevent him from encouraging other individuals to similarly pass information and directives to his co-conspirators, in the way he used his family calls to achieve the same goal. What is more, there would be no real-time monitoring of such communications allowing the BOP and FBI to intervene to stop prohibited communications when they occurred.

The *Turner* test requires the Court to inquire "whether there are alternative means of exercising the right that remain open to prison inmates," but that "where 'other avenues' remain available for the exercise of the asserted right . . . , courts should be particularly conscious of the 'measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation,"' and to consider the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. Apart from having no ready way to prevent Al-Saadi from encouraging, paying, or otherwise soliciting others on his behalf outside of the prison walls, the Court rightly notes that housing the defendant in the general prison population would expose him to other potential ways of communicating with others, including by potential use of contraband cellphones. (Opinion at 18). Given Al-Saadi's conduct while in prison so far, he has "clearly demonstrate[d]" a willingness to flout prison rules justifying his isolation from other inmates to prevent him from using those individuals as a vector to plot future terrorist activity, as he has already done with the single other means he has to effectuate contact with his terrorist coconspirators. And in doing so, he has engaged in planning terrorist plots "while in pre-trial detention." *See Basciano,* 369 F. Supp. 2d at 351.

Al-Saadi posits that, like other inmates in federal custody, he would be subjected to recorded calls if he were placed in general population, and that fact should ameliorate the Government's concerns. Even putting aside the fact that Al-Saadi's communications to date were observed in real-time, yet Al-Saadi still used those calls to communicate with his coconspirators about criminality and future threat planning, the Government's concern is not simply for Al-Saadi's own communications. Rather, if Al-Saadi were permitted contact with other inmates, the communications of any of those inmates with others outside prison could be used to pass messages and directives at Al-Saadi's urging. In this respect, the BOP has correctly measured the "impact accommodation of [Al-Saadi's further communication with other inmates] will have on guards and other inmates, and on the allocation of prison resources generally" in determining that there is no available alternative to protect the public from Al-Saadi's attempts to plot further terrorist activity from the confines of prison." Moreover, "the absence of ready alternatives" serves as "evidence of the reasonableness of a prison regulation." *See Turner*, 482 U.S. at 90.

Finally, Al-Saadi implies that his language barrier would functionally impede his communications with other inmates from raising concerns under the SAMs. That is false. Even curt, broken discussions with other inmates would make it possible for Al-Saadi to pass telephone numbers or other ways of contacting his co-conspirators, to reestablish a line of communication about their unfinished "work." For this reason, the BOP has appropriately exercised its discretion

in limiting such contacts with other inmates, who themselves are not subject to the same restrictions as Al-Saadi.

* * *

For the reasons set forth above, the Government respectfully submits that Al-Saadi's requests to be moved to the general prison population and for the Court to mandate that he be provided further calls with his immediate family be denied.

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: ______________________

Jeffrey W. Coyle
Sarah L. Kushner
David J. Robles
Assistant United States Attorneys
Southern District of New York
(212) 637-2437/2676/2550